IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ESSAR STEEL MINNESOTA LLC and | ) | Case No. 16-11626 (BLS) |
| ESML HOLDINGS INC.,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SC MESABI LITIGATION TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 18-50555 (BLS) |
| | ) | |
| v. | ) | **Re: Docket No. 11** |
| | ) | |
| CENTRAL BANK OF INDIA, AND | ) | |
| EXPORT IMPORT BANK OF INDIA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ANSWERING BRIEF OF PLAINTIFF SC MESABI LITIGATION
TRUSTEE IN OPPOSITION TO MOTION TO DISMISS COMPLAINT**

Dated: March 1, 2019

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
        akornfeld@pszjlaw.com
        tcairns@pszjlaw.com

*Attorneys for Bradley E. Scher, Litigation Trustee
to SC Mesabi Litigation Trust*

---

[1] Essar Steel Minnesota LLC has changed its name to Mesabi Metallics Company LLC.  The last four digits of its federal taxpayer identification number are 8770.  The last four digits of ESML Holdings Inc.'s federal taxpayer identification number are 8071.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

NATURE AND STAGE OF THE PROCEEDING....................................................... 3

SUMMARY OF ARGUMENTS.................................................................................. 3

FACTUAL ALLEGATIONS ...................................................................................... 6

   A.   The Project Contracts.................................................................................... 6

   B.   EPIL Obtains Financing From and Assigns its Security to the SC Lenders....................... 8

   C.   EPIL Failed to Perform Its Project Obligations................................................. 9

   D.   The Chapter 11 Cases and Proofs of Claim .................................................. 11

   E.   Pending Avoidance Actions and Objections to Claims .................................... 11

THE COMPLAINT ................................................................................................. 12

ARGUMENT ........................................................................................................... 13

   A.   The Debtors' Alter Ego Allegations Do Not Bar Their Claims and Defenses Against Affiliates ................................................................................................... 15

   B.   The Constructive Fraud Claims are Adequately Pled (First and Third Causes of Action)18

   C.   The Actual Fraud Claims are Adequately Pled (Second and Fourth Causes of Action) .. 24

   D.   The Section 502(b) and 502(d) Objections are Well Pled (Sixth Cause of Action) ......... 28

   E.   Equitable Subordination is Adequately Pled (Seventh Cause of Action)......................... 30

   F.   Declaratory Relief is Adequately Pled (Fifth Cause of Action) ...................................... 35

CONCLUSION........................................................................................................ 37

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Air Cargo, Inc. Litig. Trust v. i2 Techs., Inc. (In re Air Cargo, Inc.)*,
    401 B.R. 178 (Bankr. D. Md. 2008) ........................................................................... 15

*Asarco LLC v. Ams. Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) ................................................................................ 29

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S. Ct. 1937 (2009)....................................................................... 13

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
    473 B.R. 525 (Bankr. D. Del. 2012) ......................................................................... 18

*Bell Atl. v. Twombly*,
    550 U.S. 544, 127 S.Ct. 1955 (2007)........................................................................ 14

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
    563 F.2d 692 (5th Cir. 1977) ................................................................................... 33

*Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*,
    587 B.R. 445 (Bankr. D. Del. 2018) ................................................................... 29, 30

*Charys Liquidating Tr. v. Growth Mgmt., LLC (In re Charys Hldg. Co.)*,
    2010 Bankr. LEXIS 2073 (Bankr. D. Del. July 14, 2010)................................... 20, 27

*Charys Liquidating Trust v. McMahan Sec. Co., L.P. (In re Charys Holding Co.)*,
    443 B.R. 628 (Bankr. D. Del. 2010) ......................................................................... 26

*China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*,
    788 F.Supp. 815 (D. Del. 1992) ............................................................................... 21

*Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*,
    291 B.R. 314 (D. Del. 2003)..................................................................................... 36

*Danning v. Lavine*,
    572 F.2d 1386 (9th Cir. 1978) ................................................................................. 22

*Depomed Inc. v. Purdue Pharma L.P.*,
    2013 U.S. Dist. LEXIS 167630 (D.N.J. Nov. 26, 2013) ........................................... 32

*Downingtown Indus. & Agr. School v. Commonwealth of Pa. Dept. of Education (In re
    Downingtown Indus. & Agr. School)*,
    172 B.R. 813 (Bankr. E.D. Pa. 1994) ....................................................................... 40

*EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*,
    467 B.R. 318 (Bankr. D. Del. 2012) ......................................................................... 26

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ..................................................................................... 14

*FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*,
   2013 Bankr. LEXIS 3404 (Bankr. D. Del. Aug. 19, 2013) ................................. 23, 25

*In re AgFeed USA, LLC*,
   2015 Bankr LEXIS 1403 (Bankr. D. Del. Mar. 11, 2015)...................................... 32

*In re Augie/Restive Banking Co., Ltd.*,
   87 B.R. 242 (E.D.N.Y 1988) ................................................................................ 16

*In re Bayside Prison Litig.*,
   157 F. App'x 545 (3d Cir. 2005)........................................................................... 32

*In re Evergreen Energy, Inc.*,
   546 B.R. 549 (Bankr. D. Del. 2016) ..................................................................... 25

*In re Lids Corp.*,
   260 B.R. 680 (Bankr. D. Del. 2001) ..................................................................... 31

In re Owens Corning,
   419 F.3d 195 (3d Cir. 2005) ................................................................................. 17

*In re Pitt Penn Holding Co.*,
   484 B.R. 25 (Bankr. D. Del. 2012) ....................................................................... 14

*In re Worldwide Direct, Inc.*,
   2000 WL 33712474 (Bankr. D. Del. Nov. 22, 2000) ............................................ 31

*Lipscomb v. Clairvest Equity P'rs Ltd. P'ship (In re LMI Legacy Hldgs., Inc.)*,
   2017 Bankr. LEXIS 1150 (Bankr. D. Del. Apr. 27, 2017) .................................... 34

*LSREF2 Clover Prop. 4, LLC v. Festival Retail Fund 1, LP*,
   208 Cal. Rptr. 3d 200 (Ct. App. 2016) ................................................................. 18

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
   876 F.3d 481 (3d Cir. 2017) ................................................................................. 18

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*,
   92 F.3d 139 (3d Cir. 1996) ................................................................................... 24

*Official Comm. of Unsec. Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit P'rs L.P.
   (In re Fedders N. Am., Inc.)*,
   405 B.R. 527 (Bankr. D. Del. 2009) ................................................................ 27, 28

*Official Comm. of Unsecured Creditors v. CIT Grp./Business Credit, Inc. (In re Jevic Holding
   Corp.)*,
   Nos. 08-11006 (BLS), 08-51903, 2011 Bankr. LEXIS 3553 (Bankr. D. Del. Sep. 15, 2011) . 21

*Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*,
   326 B.R. 301 (Bankr. D. Del. 2005) ........................................................... 21, 22, 23

*Peltz v. Hatten*,
   279 B.R. 710 (D. Del. 2002)................................................................................. 24

*Pension Transfer Corp. v. Beneficiaries under the Third Amend. to Fruehauf Trailer Corp. Ret.
   Plan No. 003 (In re Fruehauf Trailer Corp.)*,
   444 F.3d 203 (3d Cir. 2006) ........................................................................... 24, 25

*Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*,
   742 F.2d 786 (3d Cir.1984) ............................................................................ 27

*Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*,
   366 B.R. 476 (Bankr. W.D. Pa. 2007) ........................................................... 34

*Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*,
   554 F.3d 382 (3d Cir. 2009) ..................................................................... 34, 35

*The Antioch Co. Litigation Trust v. Morgan (In re The Antioch Company)*,
   2011 WL 1670953, at *4 (Bankr. S.D. Ohio Apr. 28, 2011)........................... 15

*Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restive Banking Co., Ltd)*,
   860 F.2d 515 (2d Cir. 1988) ......................................................................... 16

*Zazzali v. Mott (In re DBSI, Inc.)*,
   445 B.R. 344 (Bankr. D. Del. 2011) ............................................................... 23

**Statutes**
11 U.S. C. § 548(a)(1)(B) ............................................................................... 17

11 U.S.C. § 101(31)(B) .................................................................................. 30

11 U.S.C. § 502 ............................................................................................. 27

11 U.S.C. § 502(b) .................................................................................. passim

11 U.S.C. § 502(d) ................................................................................... 27, 28

11 U.S.C. § 510(c) ........................................................................................ 29

11 U.S.C. § 548 ............................................................................................. 12

11 U.S.C. § 548(a)(1)(A) .......................................................................... 23, 24

11 U.S.C. § 550 ............................................................................................. 12

28 U.S.C. § 2201 ........................................................................................... 35

Minn. Stat. §513.44 (2015) ............................................................................. 18

Minn. Stat. §513.44(a)(1) ............................................................................... 24

**Other Authorities**
5 C. Wright & A. Miller, *Federal Practice and Procedure*
   § 1216 at 235 (3d ed. 2004) .......................................................................... 14

**Rules**
Fed. R. Bankr. P. 12(b)(6) .................................................................... 3, 4, 25

Fed. R. Bankr. P. 7008 ................................................................................... 13

Fed. R. Civ. P. 8(a) ....................................................................................... 13

Fed. R. Civ. P. 9(b) ....................................................................................... 23

Bradley E. Scher, in his capacity as Litigation Trustee of the SC Mesabi Litigation Trust (the "Trustee" or "Plaintiff"),[2] as successor in interest to debtors Essar Steel Minnesota LLC d/b/a Mesabi Metallics Company LLC and ESML Holdings Inc. (collectively, "ESML" or the "Debtors") in the above-captioned jointly administered chapter 11 cases, hereby opposes the motion (the "Motion") of defendants Central Bank of India and Export Import Bank of India (the "SC Lenders" or the "Defendants") to dismiss the *Complaint to Avoid Fraudulent Transfers Pursuant to 11 U.S.C. § § 548 and 550; Object to Claim Nos. 144 and 154; and Avoid All Liens Related to Such Transfers and Claims* (the "Complaint"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Virtually lost in the Motion is one vital fact: the SC Lenders stand in the shoes of one of the principal wrongdoers and architects of the Debtors' financial demise. Whatever their own good faith, the SC Lenders' liens and claims are derivative of the liens and claims of Essar Projects (India) Limited ("EPIL"), an affiliate of the Debtors' corporate parent, Essar Global Fund Limited ("Essar Global"). The SC Lenders never advanced funds to either Debtor. They chose to contract with and advance funds to EPIL, and to take an assignment of EPIL's rights against the Debtors. As EPIL's assignee, the SC Lenders' claims are subject to all defenses the Debtors could assert against EPIL. The Debtors have a complete defense against EPIL's claims and have claims to avoid the liens given to EPIL (and assigned to the SC Lenders)

---

[2] The Litigation Trust was created pursuant to the *Third Amended Chapter 11 Plan of Reorganization of Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc.* [Docket No. 990], confirmed by findings and order entered June 13, 2017 [Docket No. 1025].

and recover ESML's payments to the SC Lenders in respect of EPIL's obligations, for which the Debtors received less than reasonably equivalent value at a time they were insolvent.

2.      Essar Global acquired ESML to build and own a large-capacity, state-of-the-art iron ore mine and pellet plant to be constructed in Nashwauk, Minnesota (the "Project"). Essar Global and its affiliates (collectively, the "Essar Affiliates") orchestrated the Project's financing and development.  From 2008 to 2016, ESML paid Essar Global and the Essar Affiliates over $1.1 billion to complete the Project – everything it was obligated to spend under the governing construction contracts (the "Project Contracts").  Nearly half was given away to the Essar Affiliates.  ESML was left with a half-completed iron ore pellet plant that will cost hundreds of millions of dollars to complete, and over a billion dollars in claims against it.

3.      EPIL contracted to procure equipment and supplies, and to provide financing and engineering services.  EPIL (i) failed to provide equipment, (ii) provided valueless defective equipment, (iii) overcharged for equipment, (iv) failed to provide or provided deficient engineering services, and (v) failed to provide all of the contracted-for financing.  The SC Lenders' claims of over $150 million and its asserted liens are based on rights assigned by EPIL, but EPIL has no enforceable contract rights against the Debtors.   However much was given by the SC Lenders to EPIL, the liens on ESML's assets and ESML's cash transfers to the SC Lenders to pay EPIL's obligations were not matched by reasonably equivalent value *to the Debtors*, and were made when the Debtors were insolvent.  They are avoidable as fraudulent transfers, and the SC Lenders' claims must at minimum be significantly reduced under section 502(b).

2

## NATURE AND STAGE OF THE PROCEEDING[3]

4.      On June 20, 2018, the Trustee filed the Complaint.

5.      On November 5, 2018, the SC Lenders filed the Motion.

6.      On November 19, 2019, the Court entered the *Order Approving Stipulation Regarding Trustee's Extension of Time to Object to the Motion to Dismiss* [Docket No. 15], which extended the Trustee's time to respond to the Motion through and including December 19, 2018.

7.      On February 1, 2019, the Court entered the *Order Approving Stipulation Regarding Trustee's Further Extension of time to Object to the Motion to Dismiss* [Docket No. 17], which further extended the Trustee's time to respond to the Motion through and including March 1, 2019.

8.      The Trustee now files this response in opposition to the Motion, seeking that the Motion be denied in its entirety.

## SUMMARY OF ARGUMENTS

9.      The SC Lenders first argue that since the Trustee has characterized ESML as being part of a "single business enterprise" with its corporate parent and affiliates in the *First Amended Complaint and Substantive and Non-Substantive Objections to Claim Nos. 179-186* [Adv. Proc. No. 17-50001 (BLS), Docket No. 32] (the "FAC"), in the adversary proceeding styled *Essar Steel Minnesota LLC v. Essar Global Fund Limited, et al.*, Adv. Case No. 17-50001 (BLS) (the "Essar Affiliates Adversary Proceeding"), the Trustee may not sue or assert any

---

[3] Capitalized terms not otherwise defined in this Nature and Stage of Proceeding section shall have the meanings ascribed below.

defenses against EPIL, nor claim that it did not receive the exact same consideration the SC

Lenders gave to EPIL.  The argument fails: asserting alter ego liability based on ESML being

*treated as if* it was part of a single enterprise does not bar ESML from asserting claims or

defenses against EPIL or any other entity.  Absent substantive consolidation, the Debtors'

separate existence cannot be disregarded and their assets and liabilities cannot be lumped

together with its affiliates and parent.  Any such theory is highly factual in any event, and not

amenable to disposition under Rule 12(b)(6).

          10.    Sufficient facts are pled in support of the contentions that the Debtors did

not receive reasonably equivalent value and that the Debtors were insolvent at the time of the

transfers.  The Motion disregards that the legally relevant value is measured not by the loan *SC*

*Lenders made to EPIL*, but by the grossly inadequate value *EPIL* gave *to the Debtors*.  As to

solvency, a plaintiff can meet its burden without specific financial information, and sufficient

facts are pled in the Complaint and in the incorporated FAC from which insolvency may be

inferred, not just balance sheet insolvency, which the SC Lenders seem to assume is necessary,

but also based on undercapitalization, given among other things that nearly half billion of the

$1.1 billion paid by ESML was diverted to other Essar Affiliates.

          11.    Sufficient facts are pled in the Complaint and FAC from which it can be

inferred that the transfers were made with actual intent to hinder or delay creditors.  Besides the

diversion of nearly a half billion dollars, EPIL was overcharging ESML for the equipment and

supplies that it procured, it never provided all of the required financing, and it made risky

currency bets with the financing it did provide.  It may be inferred that when liens on ESML's

assets were given to EPIL (and assigned to the SC Lenders), and when ESML transferred cash to the SC Lenders to pay EPIL's obligations, it was done to ensure that EPIL's obligations to the SC Lenders were paid ahead of other creditors, knowing that there would be a significant financing shortfall, that ESML would not be able to meet its obligations to other creditors and, indeed, that the plant would not likely be completed.  These are factual issues not amenable to dismissal under Rule 12(b)(6).

12.     The equitable subordination claim is similarly fact-intensive.  A finding of inequitable conduct could stand on allegations (and plausible inferences therefrom) that EPIL was a non-statutory insider of ESML, that its dealings with ESML were not on an arms-length basis, that it knew of and participated in diverting hundreds of millions of dollars in ESML payments, that it was deliberately overcharging ESML, that it knew ESML was undercapitalized, that it knew the financing it was providing was inadequate and that it was imposing currency exchange risk on ESML that could and did further diminish the financing, and that it knew that ESML was incurring unsecured debts to other creditors that would never be repaid.

13.     The Motion ignores the Trustee's section 502(b) objection.  The SC Lenders assert claims of over $150 million.  Even if they had a direct claim against the Debtors, they (a) did not provide the entire funding commitment of Rs. 900 crore, and (b) such funding had a value of only ~$133 million as of the Petition Date.  Furthermore, the SC Lenders' claims are subject to defenses against EPIL which, as alleged, are substantial.

## FACTUAL ALLEGATIONS

14.     From its inception, ESML was completely reliant upon its affiliates, all of which are wholly owned subsidiaries of Essar Global, for virtually all of the key aspects of its business plan and operations.  Compl. at ¶ 17.  ESML's interactions with its affiliates for construction of the Project were never handled on an arm's-length basis; instead, the contracts governing its engineering, procurement, and construction (collectively, the "Project Contracts") were structured and re-structured by senior management across multiple Essar Affiliates for the benefit of the Essar Global enterprise as a whole and were designed to manipulate responsibilities and provide the most profit to entities not subject to U.S. taxation.  Compl. at ¶ 17.

### A.     The Project Contracts

15.     ESML entered into the first set of Project Contracts with its affiliates in late 2008 (collectively, the "2008 Project Contracts").  The 2008 Project Contracts were not the result of arm's-length negotiations.  They were not prepared by ESML, and ESML, which had very few employees at the time it entered into the 2008 Project Contracts, executed the 2008 Project Contracts presented to it without substantive comment.  Compl. at ¶ 18.

16.     The 2008 Project Contracts included ESML's agreement with Essar Engineering Services Limited ("Essar Engineering"), dated August 12, 2008, to perform all engineering functions for the Project, for $23 million ("2008 Essar Engineering/ESML Engineering Contract") and (b) Global Supplies FZE, dated September 9, 2008, to perform

almost all procurement work, for $365 million ("<u>2008 Global Supplies/ESML Supply</u>

<u>Contract</u>").  Compl. at ¶ 19.

      17.     In early 2010, senior management at various Essar Affiliates decided that

ESML should enter into replacement agreements (collectively, the "<u>2010 Project Contracts</u>").

ESML did not make the decision, the new contracts were not negotiated at arm's length and

Essar Affiliates handled all of the technical specifications, budgets, and construction plan issues.

Compl. at ¶ 20.

      18.     EPIL succeeded by novation to Essar Engineering's rights under the 2008

Essar Engineering/ESML Engineering Contract.  EPIL and ESML also entered a new contract

dated May 5, 2010, for the procurement of offshore goods and the supply of engineering services,

for $215 million (the "<u>Supply and Engineering Contract</u>").  EPIL took over a substantial portion

of procurement obligations in the Project Contracts, and subcontracted its engineering

obligations to Essar Engineering.  Compl. at ¶¶ 21-22.

      19.     To secure ESML's obligations under the Supply and Engineering

Contract, ESML executed the following security instruments:

     (a)     a security agreement dated December 29, 2010, pursuant to which ESML granted a continuing lien on and security interest in its assets for the benefit of secured lenders, including EPIL;

     (b)     a membership interest pledge agreement dated March 13, 2011, pursuant to which Essar Steel Holdings Limited (the then-parent of ESML) pledged certain membership interests in ESML for the benefit of certain secured lenders, including EPIL;

     (c)     a mortgage dated March 3, 2014, in respect of certain of ESML's property, granted in favor of EPIL in the amount of $182.75 million (as amended, the "<u>Minnesota Mortgage</u>");

(d)     an amended and restated security agreement dated
September 30, 2014, pursuant to which ESML granted liens on,
and security interests in, substantially all of its assets to secure
amounts owed to certain secured creditors of ESML (the
"Amended Security Agreement");

(e)     a capital membership interest pledge agreement dated
September 30, 2014, pursuant to which ESML Holdings Inc.
pledged 100% of its economic and voting interest in ESML as
security for, among other things, the financing provided by the SC
Lenders; and

(f)     an amended and restated collateral agreement dated
December 15, 2014, pursuant to which ESML assigned its rights to
certain funds and escrow accounts to secure the payment of certain
liabilities under the Supply Contract.

Compl. at ¶ 25.

B.     **EPIL Obtains Financing From and Assigns its Security to the SC Lenders**

20.     Under the Supply and Engineering Contract, EPIL was responsible for

providing engineering and offshore procurement services for the Project.  Of the $215 million to

be paid by ESML, $179.67 million was for procurement of offshore equipment (the

"Procurement Obligations") and $35.53 million was for engineering services (the "Engineering

Services").  ESML would (and did) advance 15% of the contract price of $215 million, *i.e.*,

$32.25 million.  Compl. at ¶ 29.

21.     To fulfill its Procurement Obligations, EPIL was to obtain "supply credit

facilities" in an amount of 85% of the contract price (*i.e.*, $182.75 million).  EPIL borrowed from

the SC Lenders to do so.  In or around August 2010, the SC Lenders agreed to make certain

loans in the amount of Rs. 600 crore to EPIL in connection with EPIL's obligations under the

Supply and Engineering Contract. This amount was subsequently increased to Rs. 900 crore pursuant to a facility agreement dated June 1, 2012 (the "<u>Facility Agreement</u>").  Compl. at ¶ 23.

22.     Pursuant to the Facility Agreement, EPIL would procure equipment and the SC Lenders would pay EPIL 85% of the invoiced amount.  ESML was responsible to repay the 85% (having already advanced the 15%).  To secure EPIL's obligations to the SC Lenders under the Facility Agreement, EPIL assigned to the SC Lenders its rights vis-à-vis ESML.  The Assignment Deed, dated June 1, 2012, assigned "all contracts, rights, securities and insurances of [EPIL] with respect to the [Supply and Engineering Contract]."  All claims based on the Assigned Rights are subject to ESML's defenses.  Compl. at ¶ 24.

23.     Between 2010 and 2016, ESML made transfers to the SC Lenders on account of EPIL's obligations: (a) delivery of liens and other types of security to the SC Lenders to secure that obligation, and (b) direct payment to SC Lenders and/or payments through EPIL of interest and other obligations due and owing under the Facility Agreement.  Compl. at ¶ 30.  However, the Debtors were insolvent at the time that many, if not all, of these transfers were made, and neither EPIL nor the SC Lenders provided reasonably equivalent value to the Debtors in exchange for any transfers made by ESML, including any security interests granted by the Debtors to EPIL and subsequently assigned to the SC Lenders.  Compl. at ¶ 26.  These assigned rights are the basis of the SC Lenders' claims for $150,416,096.  *Id.*

**C.     <u>EPIL Failed to Perform Its Project Obligations</u>**

24.     ESML paid $1.1 billion to Essar Affiliates for the Project but, as alleged in the FAC, approximately half of the $1.1 billion was not spent on the Project.  ESML was

insolvent or rendered insolvent because, of the $1.1 billion that ESML paid to the various Essar

Affiliates (including EPIL), approximately $500 million was not used on the Project, even

though it was needed to complete engineering, procurement, and construction work.  FAC at ¶¶

4, 115.

       25.     EPIL materially failed to perform at least three of its main functions under

the Supply and Engineering Contract: (1) EPIL failed to provide steel fabricated properly to

construct the Project (*e.g.*, it didn't account for snow loads and wasn't straight or welded

properly), (2) EPIL failed to provide all of the equipment it was obligated to procure for the

Project, and (3) EPIL failed to complete all required engineering services.  Indeed, EPIL failed to

deliver, and indeed sometimes even failed to order, a significant amount of goods, including

without limitation, pellet removal cranes, valves, expansion joints, slurry pumps, and water

pumps.  Compl. at ¶¶ 27-28.  EPIL also grossly overcharged ESML, in collaboration with other

Essar Affiliates, particularly for steel infrastructure.  Compl. at ¶ 33; FAC at ¶ 337.

       26.     In addition to overcharging and providing defective steel and other items,

it did not secure its supplier credit facilities in U.S. dollars.  It opened the facilities in Indian

rupees thereby exposing the Project to unnecessary risk related to the significant (negative) shift

in the exchange rate of the Indian rupee (Rs.) vis-à-vis the U.S. dollar.  Between August 2010

and July 2016, the exchange rate skyrocketed from trading at 46.8 Rs./USD to 67.4 Rs./USD, yet

the SC Lenders took security interests based on providing $182.75 million in financing to EPIL.

The rupee-dollar exchange rate continued to deteriorate as ESML executed the Minnesota

Mortgage and, later, the Amended Security Agreement—both of which ultimately accrued to the

SC Lenders' benefit.  As of the date of the Amended Security Agreement, the SC Lenders knew

(or certainly should have known) that there was a financing shortfall of $30-40 million.

Discovery will tell if EPIL and/or the SC Lenders ever intended to provide the full amount of the

required financing.  Compl. at ¶ 33.

### D.    The Chapter 11 Cases and Proofs of Claim

27.    On August 15, 2016, the Debtors filed their Schedules of Assets and

Liabilities [Docket Nos. 223, 224] listing the Central Bank of India (as agent to the SC Lenders)

as holding a contingent, unliquidated and disputed claim in the amount of $150,416,096.  Compl.

at ¶ 36.  On September 30, 2016, the SC Lenders filed proofs of claim against Debtor ESML

Holdings Inc. ("Claim No. 144") and Debtor ESML ("Claim No. 154") as secured claims in the

amount of $150,416,096.  Compl. at ¶ 37.

28.    On October 27, 2016, EPIL filed (1) a proof of claim against ESML for

$155,421,977, of which $129,416,289 is asserted as a general unsecured claim and $26,005,688

is asserted as a priority claim ("Claim No. 181"), for equipment and materials and engineering

services, and (2) another general unsecured claim against ESML in the amount of $249,886,561

as a general unsecured claim against ESML ("Claim No. 182").[4]  Compl. at ¶ 38.

### E.    Pending Avoidance Actions and Objections to Claims

29.    On November 19, 2016, the Debtors filed the *Debtors' First (Non-*

*Substantive) Omnibus Objection to Certain Claims* [Bankr. Docket No. 553] (the "Claim

---

[4] The alleged basis of Claim No. 182 is "1) Supplier's Credit provided under the Supply and Engineering Contract between Debtor and Creditor; 2) Corporate Guarantee Invocation of Holding company (Essar Projects Limited, Dubai)."

Objection"), seeking to disallow EPIL's Claim Nos. 181 and 182 for lack of documentation and as inconsistent with the Debtors' books and records.  Compl. at ¶ 41.

30.    On January 11, 2017, Debtor Essar Steel Minnesota LLC d/b/a Mesabi Metallics Company LLC filed the original complaint in the Essar Affiliates Adversary Proceeding.  The FAC therein, filed August 29, 2017 and incorporated by reference in the Complaint, asserts claims against Essar Global and other Essar Affiliates, including EPIL, for breach of contract, fraudulent transfer, breach of fiduciary duties and aiding and abetting breach of fiduciary duties, tortious interference with contract, promissory estoppel, claims disallowance, equitable subordination, and alter ego liability.  The FAC seeks damages of over $1 billion. EPIL is named as a defendant on many, if not all, of the claims, including the turnover of approximately $206,136,046 in fraudulent transfers and approximately $3,093,883 in preferential transfers.[5]

### **THE COMPLAINT**

31.    Based on the foregoing facts, as alleged in greater detail in the Complaint, the Trustee asserts the following claims for relief: (1) to avoid and recover as constructive fraudulent transfers under Minnesota law (a) the Debtors' transfers of liens and other security to the SC Lenders related to the Facility Agreement between EPIL and the SC Lenders (the

---

[5] In addition, on December 22, 2017, U.S. Bank National Association ("U.S. Bank"), as agent for the prepetition term lenders, filed the Objection of U.S. Bank National Association to Proof of Claim Nos. 144 and 154 Filed by Central Bank of India and Export Import Bank of India [Bankr. Docket No. 1397] seeking to disallow the SC Lenders' claims on the grounds that (a) EPIL failed to perform under the Supply and Engineering Contract and the Debtors are entitled to recovery of all transfers made through such agreement as detailed in the Essar Affiliates Adversary Proceeding; (b) the SC Lenders' claims, asserted as an assignee of EPIL, are subject to all of the defenses that the Debtors could assert against EPIL; and (c) any transfers made directly from the Debtors to the SC Lenders were made for less than reasonably equivalent value and are recoverable by the Debtors.  Compl. at ¶ 43.

"Facility Agreement Liens"), and (b) payments to the SC Lenders to satisfy EPIL's obligations thereunder  identified in Exhibit A to the Complaint ("Six Year Fraudulent Transfers"); (2) to avoid and recover the Facility Agreement Liens and Six Year Fraudulent Transfers as actual fraudulent transfers under Minnesota law; (3) to avoid and recover as constructive fraudulent transfers under Bankruptcy Code §§ 548 and 550 and related statutes the transfers of the Facility Agreement Liens and the payments of EPIL's obligations identified  in Exhibit B to the Complaint (the "Two Year Transfers"); (4) to avoid and recover as intentional fraudulent transfers under Bankruptcy Code §§ 548 and 550 and related statutes the Facility Agreement Liens and the Two Year Transfers; (5) for declaratory relief determining the nature, extent, priority and validity of the Facility Agreement Liens; (6) objecting to the SC Lenders' Claim Nos. 144 and 154 under section 502(b) and (d); and (7) for equitable subordination.

## **ARGUMENT**

32.     A defendant's burden on a motion to dismiss is heavy.  While a complaint must do more than set forth conclusory statements or recite the bare elements of a cause of action, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009), the pleading standard is a liberal one.  Rule 8(a), made applicable to adversary proceedings by Bankruptcy Rule 7008, provides that, in asserting a claim, the pleader need only set forth "(1) a short and plain statement showing that the pleader is entitled to relief; and (2) a demand for the relief sought."  Fed. R. Civ. P. 8(a).[6]  "The purpose of the statement is to provide 'fair notice' of the claim and 'the

---

[6] The heightened pleading standard set forth in Rule 9 is discussed in connection with the actual fraud claims in section C.1, below.

grounds upon which it rests.'"  *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)

(citation omitted).

33.    In making such a determination, the court must "accept all factual

allegations [in the complaint] as true, construe the complaint in the light most favorable to the

plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)

(citation omitted).  This does not require "heightened fact pleading of specifics, but only enough

facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "Even

post-*Twombly*, it has been noted that a plaintiff is not required to establish the elements of a

prima facie case but instead, need only put forth allegations that raise a reasonable expectation

that discovery will reveal evidence of the necessary element."  *Fowler*, 578 F.3d at 213

(quotation and citation omitted).  Accordingly, a plaintiff "gets the benefit of the doubt" with

respect to the factual allegations in its complaint in connection with a motion to dismiss.  *In re

Pitt Penn Holding Co.*, 484 B.R. 25, 34 (Bankr. D. Del. 2012).

34.    In addition, courts generally recognize that when a party other than the

debtor files the complaint, the party "is entitled to some flexibility when filing a complaint based

on information which may only be available through discovery."  *The Antioch Co. Litigation

Trust v. Morgan (In re The Antioch Company)*, 2011 WL 1670953, at *4 (Bankr. S.D. Ohio Apr.

28, 2011); *see also Air Cargo, Inc. Litig. Trust v. i2 Techs., Inc. (In re Air Cargo, Inc.)*, 401 B.R.

178, 192, n. 7 (Bankr. D. Md. 2008) (noting that courts have consistently relaxed heightened

pleading standards "in cases pursued by a trustee rather than the debtor").

35.     As set forth herein, the Complaint's allegations unquestionably "raise a right to relief above the speculative level." *Twombly,* 550 at 555 (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 at 235-236 (3d ed. 2004)).  Hence, the Motion should be denied.

A.    **The Debtors' Alter Ego Allegations Do Not Bar Their Claims and Defenses Against Affiliates**

36.     The SC Lenders first argue that, having characterized ESML and EPIL in the Essar Affiliates Adversary Proceeding as being part of a "single business enterprise," ESML may not treat EPIL as a separate entity, *i.e.*, it may not sue EPIL for breach of contract, and all value received by EPIL from the SC Lenders must also be considered to have been received by ESML.

37.     The FAC asserts alter ego liability and alleges that Essar Global treated the Debtors and Essar Affiliates, including EPIL, as if they were a single business enterprise, with assets being siphoned from some and given to others based on need and convenience. Alleging alter ego liability does not mean a subsidiary cannot sue its parent or affiliates.  The SC Lenders confuse alter ego liability with substantive consolidation.  Only with the latter – where assets and liabilities of multiple entities are consolidated into one collective pool of assets and liabilities – would consideration to one corporate entity automatically constitute consideration to the other entities.  There has been no substantive consolidation of the Essar Affiliates.  The Debtors can – and are – suing them.  Indeed, if they were substantively consolidated, there would be no need to do so.

38.     The SC Lenders prove the point by citing a reversed decision, *In re Augie/Restive Banking Co., Ltd.*, 87 B.R. 242, 247 (E.D.N.Y 1988), to support the proposition that when affiliated corporations operate as a single economic unit, it is impossible to advance money to one entity without benefit to the other.  First, dispositively, unlike here, the *Augie* court had approved substantive consolidation.  *Id.* at 243.  Furthermore, the Second Circuit *reversed* on substantive consolidation because the evidence was insufficient.  *Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restive Banking Co., Ltd)*, 860 F.2d 515 (2d Cir. 1988).  It specifically criticized the cited proposition, stating that comingling of assets "can justify substantive consolidation only where the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is possible." *Id.* at 519 (internal quotation and citation omitted).  Importantly, the Second Circuit stated that the "[b]usiness functions may have been commingled, but that hardly weighs in favor of consolidation in the instant case because the principal beneficiary of consolidation, [a secured lender], was not deceived and fully realized it was dealing with separate corporate entities." *Id.* at n. 519.

39.     *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005) governs substantive consolidation in the Third Circuit.  The court articulated a slightly different standard: "[W]hat must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their

assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id*. at 210-11.

40.     Regardless, there has been no substantive consolidation.  The inquiry would be factual, in any event.  Notably, the SC Lenders certainly acted intentionally in entering into an agreement with EPIL and not the Debtors.  Whatever legal or tax advice they were following was clearly not guided by fraudulent transfer concerns.

41.     Alter ego liability is a different animal.  It is an equitable remedy by which a subsidiary's liability may be imposed upon its corporate parent in order to prevent the corporate shield from being used for fraudulent purposes, not a defense against liability for a party sued by the subsidiary.  *LSREF2 Clover Prop. 4, LLC v. Festival Retail Fund 1, LP*, 208 Cal. Rptr. 3d 200, 212 (Ct. App. 2016) ("Alter ego is normally a basis for liability, not a defense.").  Even if alter ego was conceptually applicable here (it is not), such factual issues could not be decided on a motion to dismiss.  *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 500 (3d Cir. 2017) (describing it as "fact-based inquiry").  As the Court observed in *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 556 (Bankr. D. Del. 2012), it is a multi-factor analysis, and undercapitalization alone "is a factual issue that cannot be resolved in the context of a motion to dismiss." *Id*. at 553.

42.     In short, the "admission" in the FAC that the Debtors were controlled by their parent and treated as a single enterprise is irrelevant (and would remain so even if the Debtors had actually obtained relief in the Essar Affiliates Adversary Proceeding based on having taken that position, as judicial estoppel requires): it does not preclude the Debtors from

asserting claims and defenses against EPIL or from contending that consideration to EPIL is not

the same as consideration to the Debtors.

**B.**     **The Constructive Fraud Claims are Adequately Pled (First and Third Causes of**

**Action)**

43.     The SC Lenders next argue that the constructive fraudulent transfer claims

fail because the Trustee has not alleged facts demonstrating that the Debtors were insolvent at

the time of the transfer or that they failed to receive reasonably equivalent value.  But the alleged

facts and the inferences plausibly drawn therefrom disprove both arguments.

44.     Section 548(a)(1)(B) of the Bankruptcy Code authorizes the avoidance of

transfers of interests in the debtor's property occurring within two years prior to the petition date

if the debtor "received less than a reasonably equivalent value in exchange for such transfer or

obligation" and

> (ii) (I) was insolvent on the date that such transfer was made or
> obligations was incurred, or became insolvent as a result of such
> transfer or obligation;
>
> (II) was engaged in business or about to engage in business for
> which any property remaining with the debtor was an unreasonably
> small capital;
>
> (III) intended to incur, or believed that that the debtor would incur,
> debts that would be beyond the debtor's ability to pay as such
> debts matured.

11 U.S.C. § 548(a)(1) (B)(i) and (ii)(I).

45.     Likewise, the Minnesota Uniform Fraudulent Transfer Act provides:

> (a) A transfer made or obligation incurred by a debtor is voidable
> as to a creditor, whether the creditor's claim arose before or after

the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Minn. Stat. §513.44 (2015).

46.     To survive a motion to dismiss, a constructive fraudulent transfer claim predicated on the foregoing provisions must allege sufficient facts that plausibly show: (i) a transfer within the applicable time period; (ii) the debtor's insolvency; and (iii) a lack of reasonably equivalent value (or fair consideration). *Charys Liquidating Tr. v. Growth Mgmt., LLC (In re Charys Hldg. Co.)*, 2010 Bankr. LEXIS 2073, at *17 (Bankr. D. Del. July 14, 2010). The Motion does not challenge the first factor regarding transfers within the applicable time period (six years under Minnesota law and two years under the Bankruptcy Code).

47.     Courts in the Third Circuit have recognized that constructive fraudulent transfer claims are not analyzed under heightened pleading standards. *Id.* at *7, n.2; *China Resource Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 788 F.Supp. 815, 819 (D. Del. 1992) ("Despite the similarity in the terms 'fraud' and 'fraudulent conveyance,' the pleading requirements for fraud are not necessarily applicable to pleadings alleging a [constructive] fraudulent conveyance.").

19

1.      *Insolvency is Adequately Pled*

48.     As this Court has held, a plaintiff can meet its burden of pleading

insolvency without providing specific financial information.  *Official Comm. of Unsecured*

*Creditors v. CIT Grp./Business Credit, Inc. (In re Jevic Holding Corp.)*, Nos. 08-11006 (BLS),

08-51903, 2011 Bankr. LEXIS 3553, at *31 (Bankr. D. Del. Sep. 15, 2011) ("the Committee

alleges that Jevic was 'insolvent or would be rendered insolvent by the transactions undertaken

in connection with the [Jevic] LBO, the [Refinancing Facility], and Sale-Lease Back.' [ ] The

Court concludes that these allegations are sufficient to survive this motion.").  *See also Official*

*Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 306-7

(Bankr. D. Del. 2005).

49.     This Court's opinion in *DVI* supports a finding that the Trustee has

adequately pled insolvency.  The Court found that insolvency was sufficiently pled when the

complaint alleged that the debtor (1) was undercapitalized, (2) had a cash flow that was

insufficient to satisfy its obligations, and (3) had insufficient capital to contribute to collateral

accounts to secure its obligations. *DVI*, 326 B.R. at 306-07.  In reaching its holding, the court

noted that "[e]ven allegations of insolvency in general terms comply with Rule 8 and there is no

need to allege the particulars." *Id.* at 307 (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th

Cir. 1978) (noting that a "general allegation of insolvency in a complaint constitutes an

allegation of an ultimate fact and is therefore a sufficient pleading.") (citation omitted)).  Here,

the Complaint contains similar allegations sufficient to withstand a motion to dismiss.  Like *DVI*,

the Complaint contains allegations that ESML was undercapitalized, had no profit generating

operations, and did not have the ability to independently satisfy its obligations, as it was completely reliant upon its affiliates. (Compl. at ¶¶ 17, 20, & 33; FAC at ¶¶ 7, 371). For these reasons, insolvency has been adequately pled.

50.    The Complaint alleges more than sufficient facts from which it can be inferred that at the time or as a result of the transfers, the Debtors were insolvent on a balance sheet basis, or were engaged in a business for which they were undercapitalized, or that they should have known they would be unable to pay debts as they came due. As is laid out in the Complaint, ESML had no business: it was acquired in 2008 to build and own an iron ore mine and pellet plant and was completely reliant upon its affiliates.   In other words, it had no operating, profit-generating business. From 2008 to 2016, ESML paid Essar Global and its various affiliates over $1.1 billion to complete the Project, but approximately *$500 million was not spent on the Project*. Compl. at ¶ 2; FAC at ¶¶ 4, 115. The Project never became operational: "ESML was left with a half-completed plan that will costs hundreds of millions of dollars more to finish; and is burdened with over a billion dollars of claims." *Id*. Money was diverted, equipment was overbilled and the financing obtained by EPIL was inadequate and in a devaluing currency. On such factual allegations, the Court cannot possibly "conclude that the [Trustee] can prove no set of facts in support of its insolvency claim that would entitle it to relief." *DVI*, 326 B.R. at 307.

51.    Again, the predicate for raising lack of insolvency presents factual issues that are not suitable for a motion to dismiss. "[W]hether the company was insolvent at the time of the transfers at issue 'is generally a factual determination not appropriate for resolution in a

motion to dismiss.'" *FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 2013 Bankr. LEXIS 3404, at *12 (Bankr. D. Del. Aug. 19, 2013) (denying motion to dismiss) (citing *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011).

 2. *ESML Received Less Than Reasonably Equivalent Value*

 52. The Complaint adequately alleges that the Debtors did not receive reasonably equivalent value in exchange for their transfers of the Facility Agreement Liens and the Six Year Transfers and Two Year Transfers. Reasonably equivalent value is not defined in the Bankruptcy Code. *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002). The Third Circuit applies a two-step approach to determine whether a debtor received reasonably equivalent value in exchange for a transfer or obligation. *Pension Transfer Corp. v. Beneficiaries under the Third Amend. to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006). First, "a court must consider whether, 'based on the circumstances that existed at the time' of the transfer, it was 'legitimate and reasonable' to expect some value accruing to the debtor." *Id.* (quoting *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996). Second, if the court finds that the debtor received any value, the court must engage in a *fact-driven* comparison between such value and the transfer sought to be avoided to determine "whether the debtor got roughly the value it gave." *Pension Transfer Corp.*, 444 F.3d at 212-213. Courts determine reasonably equivalent value by using a totality of the circumstances approach, taking into account "the good faith of the parties, the difference between the amount paid and the market

value, and whether the transaction was at arms-length." *In re Evergreen Energy, Inc*., 546 B.R.

549, 563 (Bankr. D. Del. 2016) (citation omitted).

53.    The SC Lenders argue they provided reasonably equivalent value because

they lent money for the Project and received security interests in exchange.  This argument

ignores the fact that the SC Lenders did not advance funds to the Debtors.  Rather, they

contracted with and advanced funds to EPIL, and stand in the shoes of EPIL, which assigned to

the SC Lenders its rights under its $215 million Supply and Engineering Contract.  As EPIL's

assignee, the SC Lenders' claims are subject to all defenses the Debtors could assert against

EPIL, and as alleged, EPIL has no rights to enforce.

54.    Finally, any determination of whether reasonably equivalent value was

received requires a factual inquiry not suitable for determination on a motion to dismiss.

Assuming the receipt of value, the second step of the analysis is a factual determination whether

such value and the transfer sought to be avoided were of roughly the same value.  *Pension*

*Transfer Corp*., 444 F.3d at 212.  In *FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC)*, 2013

Bankr. LEXIS 3404, at *11 (Bankr. D. Del. Aug. 19, 2013), defendants argued in a motion to

dismiss that reasonably equivalent value was exchanged for the transfers.  However, the Court

stated that "the issue of 'reasonably equivalent value' requires a factual determination that

cannot be made on a motion to dismiss." *Id.* (citing *EPLG I, LLC v. Citibank, N.A. (In re*

*Qimonda Richmond, LLC)*, 467 B.R. 318, 327 (Bankr. D. Del. 2012));  *Charys Liquidating Trust*

*v. McMahan Sec. Co., L.P. (In re Charys Holding Co.)*, 443 B.R. 628, 638 (Bankr. D. Del. 2010)

("reasonably equivalent value is a fact intensive determination that typically requires testing

through the discovery process."). The Court should not consider the SC Lenders' arguments regarding reasonably equivalent value at this time.

## C.    **The Actual Fraud Claims are Adequately Pled (Second and Fourth Causes of Action)**

55.    The SC Lenders assert that the actual fraudulent transfer claims fail because insufficient facts are pled to support an inference that the Debtors acted with intent to defraud creditors. The alleged facts, and plausible inferences therefrom, however, support at least three badges of fraud, which this Court has held to be sufficient to survive a motion to dismiss.

### 1.    *Heightened Pleading Standards Under Rule 9(b)*

56.    The Second and Fourth Causes of Action are actual fraudulent transfer claims under Bankruptcy Code 548(a)(1)(A) and under Minnesota's Uniform Fraudulent Transfer Act. While they are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211 (1985), "[i]t is not a defendant's fraudulent intent that must be pled with particularity, but the circumstances constituting fraud." *Charys Liquidating Tr.*, 2010 Bankr. LEXIS 2073, at *8. "Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegation of fraud." *Seville Indus.*, 742 F.2d at 791.

   *2.*  <u>*The Actual Fraud Claims are Adequately Pled*</u>

   57.  "Under Section 548(a)(1)(A), transfers or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay, or defraud a past or future creditor. The definition of 'transfer' is broad, and includes 'the creation of a lien,' such as a security interest, and 'each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property.'" *Official Comm. of Unsec. Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit P'rs L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009). Similarly, Minnesota law provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor." Minn. Stat. §513.44(a)(1).

   58.  Sufficient facts are pled in the Complaint and FAC from which it can be inferred that the transfers were made with actual intent to hinder or delay creditors. We respectfully submit that when the alleged factual backdrop is the diversion of $500 million of ESML's $1.1 billion in payments, the range of inferences that can and should be deemed plausible becomes very broad indeed. Besides the diversion, EPIL was overcharging ESML for the equipment and supplies that it procured, was supplying patently defective goods and services, never provided all of the financing required under the Supply and Engineering Contract, and it made risky currency bets with the financing it did provide. It may be inferred that when liens on ESML's assets were given to EPIL (and assigned to the SC Lenders), and when ESML

transferred cash to the SC Lenders to pay EPIL's obligations, it was done to ensure that EPIL's

obligations to the SC Lenders were paid ahead of other creditors, knowing that there would be a

significant financing shortfall, that ESML would not be able to meet its obligations to other

creditors and, indeed, that the plant would not likely be completed.  These are factual issues not

amenable to dismissal under Rule 12(b)(6).

59.     Badges of fraud have historically been used to show fraudulent intent.

"Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to

admit such an intent, courts may infer actual intent by examining the circumstances and

considering whether various 'badges of fraud' are present." *Fedders*, 405 B.R. at 545.  The

"badges of fraud" include, but are not limited to: (1) the relationship between the debtor and the

transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtors;

(4) how much of the debtor's estate was transferred; (5) reservation of benefits, control or

dominion by the debtor over the property transferred; and (6) secrecy or concealment of the

transaction.  *Id.*

60.     Conscious wrongdoing and at least three badges of fraud are adequately

pled in the Complaint.  With respect to conscious wrongdoing, the Complaint and the FAC

allege that ESML intended or believed that it would incur debts beyond its ability to pay as such

debts matured. Compl. at ¶¶ 62, 63, 89, & 90; FAC at ¶¶ 266 & 307.  With respect to the badges

of fraud, Plaintiff has alleged at least three of the badges: (1) a close relationship, (2) inadequate

consideration for the conveyance, and (3) insolvency.

61.     First, as set forth more fully in section E.2 (Equitable Subordination) below, the SC Lenders are a non-statutory insider and that EPIL (whom the SC Lenders stand in the shoes of) exercised substantial control over ESML, which supports the first badge of fraud, evidencing a close relationship between the Debtor and the transferee. *See e.g. Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC),* 587 B.R. 445, 461 (Bankr. D. Del. 2018) (holding that controlling a debtor from time to time supports the first badge of fraud); *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 372 (S.D. Tex. 2008) (holding that a transfer with an insider supports the first badge of fraud).

62.     Second, the Complaint alleges that ESML did not receive adequate consideration for the Six Year Fraudulent Transfers and the Two Year Fraudulent Transfers. The Debtors received any purported consideration directly from EPIL, not the SC Lenders, and that consideration was inadequate because EPIL failed to perform or defectively performed material obligations under the Supply and Engineering Contract and, further, intentionally overcharged ESML for the items procured by EPIL, particularly the steel infrastructure (Compl. at ¶ 33), and conspired with other Essar Affiliates to cheat ESML for the benefit of the other Essar Affiliates.

63.     Third, as set forth more fully in section B.1 (Constructive Fraud) above, the Trustee has alleged more than sufficient facts indicating that the Debtors were insolvent when the transfers were made or were rendered insolvent.

64.     When three badges of fraud have bene alleged, this Court has held that this is sufficient to survive a motion to dismiss. *Beskrone*, 587 B.R. at 461 (finding three badges of

fraud present and denying a motion to dismiss).  Accordingly, the actual fraud claims are well pled.

**D.     The Section 502(b) and 502(d) Objections are Well Pled (Sixth Cause of Action)**

65.    The SC Lenders argue that the Sixth Cause of Action should be dismissed solely on the grounds that it is premature because no judgment has been entered against them, even though the Complaint contains such claims.  Section 502 of the Bankruptcy Code states that "the court shall disallow any claim of any entity from which property is recoverable under section . . . section 550 . . . unless such entity or transferee has paid the amount, or turned over any such property for  which such entity or transferee is liable under section . . . 550 . . . of this title."

66.    As the Court is aware, authority is mixed on whether it is necessary to obtain a judgment before objecting to a claim under section 502(d).  *In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001), held that "[t]o disallow a claim under section 502(d) requires a judicial determination that a claimant is liable."  However, the authority cited in *Lids* has roots in Judge Walrath's decision in *In re Worldwide Direct, Inc.*, 2000 WL 33712474 (Bankr. D. Del. Nov. 22, 2000) ("Section 502(d) permits disallowing a claim from whom money is due, but to determine the creditors' liability the Debtors must sue.  Before we may pronounce that a claimant is liable, Debtors must commence an adversary complaint which is viable.").  The procedural vehicle in *Worldwide Direct* was an omnibus claim objection, in which context the decision made perfect sense, since an adversary proceeding is required to avoid a transfer.

67.    Here, we have an adversary proceeding, in which the predicate avoidance claims are already being asserted.  Notwithstanding this Court's decision in *In re AgFeed USA, LLC*, 2015 Bankr LEXIS 1403,at *11 (Bankr. D. Del. Mar. 11, 2015), we respectfully submit that the Court could bifurcate this adversary proceeding, first determining the First through Fourth Causes of Action, and then determining the section 502(d) count.  Bifurcation is within the Court's discretion.  *In re Bayside Prison Litig.*, 157 F. App'x 545, 547 (3d Cir. 2005) ("The decision to bifurcate is within a district judge's sound discretion.").  "In determining whether bifurcation is warranted, the court must consider whether separate trials would further convenience or avoid prejudice or promote judicial economy."  *Depomed Inc. v. Purdue Pharma L.P.*, 2013 U.S. Dist. LEXIS 167630, at *20 (D.N.J. Nov. 26, 2013).  Here, bifurcation would avoid the need to commence a second proceeding after this one is concluded.  If the Court is unwilling to do so, the Trustee will dismiss this claim without prejudice.

68.    Because dismissal of the 502(d) claim would require the Trustee to file a separate complaint based upon the same facts alleged here, the Court should not dismiss the Sixth Cause of Action, as this bifurcated procedure will further convenience to the parties, avoid prejudice to the Trustee, and promote judicial economy.  However, if the Court is not willing to entertain bifurcating this adversary proceeding, the Trustee will withdraw the 502(d) objection without prejudice.

69.    Finally, the Motion does not address the section 502(b) objection, relating to the enforceability of the SC Lenders' claims, acquired by assignment from EPIL and subject to defenses against EPIL.

29

**E.**     **Equitable Subordination is Adequately Pled (Seventh Cause of Action)**

70.     The SC Lenders argue that the Trustee has not stated a claim for equitable

subordination because there are no allegations that the SC Lenders behaved inequitably, that any

creditor was harmed, and that equitable subordination is incompatible with other provisions of

the Bankruptcy Code.  Once again, the SC Lenders' arguments ignore the fact that they stand in

the shoes of EPIL.

71.     The doctrine of equitable subordination, codified in section 510(c) of the

Bankruptcy Code, authorizes a bankruptcy court to "subordinate for purposes of distribution all

or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c).  The

Third Circuit requires three elements be established before a court may subordinate a creditor's

claim: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the

misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair

advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent

with the provisions of the Bankruptcy Code." *In re Winstar Communs., Inc.*, 554 F.3d at 411

(quotations and brackets omitted) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563

F.2d 692, 699-700 (5th Cir. 1977)).

     *1.*     *The Complaint Alleges that EPIL Engaged in Inequitable Conduct.*

72.     The SC Lenders argue that the Trustee failed to plead that the SC Lenders,

as traditional, non-insider lenders, engaged in inequitable conduct.  But the SC Lenders are

insiders because they stand in the shoes of EPIL, an affiliate of Essar Global, which did not deal

with EMSL at arm's-length.[7]   The Code defines an "insider" of a corporate debtor as including

"(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv)

partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi)

relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. §

101(31)(B). "However, a party may also be considered a non-statutory insider, even without

actual control of the debtor, when there is a close relationship between debtor and creditor and

when transactions between them were not conducted at arm's length." *Lipscomb v. Clairvest*

*Equity P'rs Ltd. P'ship (In re LMI Legacy Hldgs., Inc.)*, 2017 Bankr. LEXIS 1150, at *26 (Bankr.

D. Del. Apr. 27, 2017) (citing *Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554

F.3d 382, 397 (3d Cir. 2009) ("the question is whether there is a close relationship [between the

debtor and creditor] and ... anything other than closeness to suggest that any transactions were

not conducted at arm's length.")).

73.    The Complaint alleges that there was a close relationship between ESML

and EPIL.  Further, the Complaint and the FAC repeatedly allege that ESML was not dealing

with any of the Essar Affiliates, including EPIL, at arm's-length:

> (a)    "ESML's interactions with its affiliates for construction of
> the Project were never handled on an arm's-length basis."  Compl.
> at ¶ 17.

> (b)    "The 2008 Project Contracts were not the result of arm's-
> length negotiations."  Compl. at ¶ 18.

---

[7] The Court should not consider the SC Lenders' non-insider arguments at this time because the determination of insider status should not be decided at the motion to dismiss stage.  "Ordinarily, determination of insider status is a question of fact . . . that is made on a case-by-case basis after the consideration of various relevant factors."  *Shearer v. Tepsic (In re Emergency Monitoring Techs., Inc.)*, 366 B.R. 476, 492 (Bankr. W.D. Pa. 2007) (internal quotations and citations omitted).

(c)     "As with the 2008 Project Contracts, the 2010 Project Contracts were not negotiated at arm's length; were largely drafted by Essar Affiliates, not ESML; and Essar Affiliates handled all of the technical specifications, budgets, and construction plan issues." Compl. at ¶ 20.

(d)     "ESML's interactions with its affiliates for construction of the Project were never handled on an arm's-length basis. Instead, the contracts governing its engineering, procurement, and construction (collectively, the "Project Contracts") were structured and restructured by senior management across multiple Essar Global entities for the benefit of the Essar Global enterprise as a whole and were designed to manipulate responsibilities and provide the most profit to entities not subject to U.S. taxation." FAC at ¶ 29.

(e)     "Contracts between Essar Global and its subsidiaries, and between the affiliate subsidiaries, were not negotiated at arm's length." FAC at ¶ 130.

74.     Courts have recognized that "[t]he inequitable conduct underlying equitable subordination may be unrelated to the acquisition or assertion of the particular claim whose status is at issue." *Winstar*, 554 F.3d at 412. For example, in *Winstar,* the Third Circuit affirmed the bankruptcy court's findings of harm to the debtors and its creditors, stating that the inequitable conduct was caused, in part, by the creditor causing the debtor to purchase unneeded equipment. *Id.* at 414. Similar to requiring a debtor to purchase unnecessary equipment, here, the Complaint alleges that EPIL took advantage of its controlling relationship with ESML by deliberately overcharging for the items procured by EPIL, particularly the steel infrastructure. Compl. at ¶ 33. The FAC also alleges that the Essar Affiliates, including EPIL, conspired to cheat ESML for the benefit of themselves, instead of attempting to obtain the best possible deals and prices for ESML. FAC at ¶ 337.

75.     Courts have recognized three general categories of conduct which may constitute inequitable conduct warranting equitable subordination: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtors as a mere instrumentality or alter ego. *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 327-28 (D. Del. 2003). In support of equitable subordination, the Trustee has alleged facts supporting fraud and undercapitalization.

76.     The factual allegations and inferences therefrom support findings that EPIL was a non-statutory insider of ESML, that its dealings with ESML were not on an arms-length basis, that it knew of and participated in diverting hundreds of millions of dollars in ESML payments, that it was deliberately overcharging ESML, that it knew ESML was undercapitalized, that it knew the financing it was providing was inadequate and that it was imposing currency exchange risk on ESML that could and did further diminish the financing, and that it knew that ESML was incurring unsecured debts to other creditors that would never be repaid. The Trustee has adequately pled actual fraudulent transfer claims, as discussed above, and as also discussed above, it may readily be inferred that the Debtors had insufficient capital to engage in their "business," *i.e.*, the capital-intensive development of the ore mine and pellet plant. After the diversion of $500 million in ESML payments, "ESML was left with a half-completed plan that will costs hundreds of millions of dollars more to finish; and is burdened with over a billion dollars of claims." Compl. at ¶ 2. The Project never became operational. It is clear the ESML was undercapitalized.

2.       *The Complaint Alleges Facts Showing Injury to Creditors.*

77.       The SC Lenders attempt to argue that because the Complaint does not

allege that the SC Lenders engaged in inequitable conduct, the Trustee has not alleged that any

creditor was harmed or that the SC Lenders received an unfair advantage by obtaining security

interests in ESML's collateral.  But the focus is on their assignor, EPIL, and the result of the

scheme described herein to steal from, shortchange and overcharge ESML was to render

impossible the completion of the Project, with the inevitable result that ESML would never

generate income to pay creditors, who extended credit and performed services without knowing

that the Project had a significant financing shortfall and that ESML was being overcharged for

products.  All of ESML's creditors were harmed by ESML's de facto assumption of EPIL's

liabilities on a secured basis even as ESML assets were being steadily depleted by diversion and

overcharging and transfers to pay EPIL obligations.

3.       *Equitable Subordination is Not Inconsistent with the Bankruptcy Code*

78.       The SC Lenders assert vaguely that equitable subordination of their claims

would be inconsistent with the Bankruptcy Code because the Plan and the Intercreditor

Agreement evidence the intent of the Debtors and the other secured lenders to treat the SC

Lenders' claims *pari passu* with the other secured lenders' claims.  The Motion does not

elaborate how the Plan or the Intercreditor Agreement evince that intent, nor is it clear how

either document is relevant to the inquiry of whether equitable subordination is not inconsistent

with the Bankruptcy Code.  Nonetheless, the history of these chapter 11 cases shows otherwise.

The Debtors and the other secured lenders have made it clear that they disputed the SC Lenders'

Claims and never intended to treat them as allowed secured claims.

79.     First, in August of 2016, the Debtors filed their Schedules listing the claim

of the Central Bank of India (as agent to the SC Lenders) as contingent, unliquidated, and

disputed.  Compl. at ¶ 36.  Second, other secured parties have objected to the SC Lenders'

Claims.  In December of 2017, U.S. Bank, as agent for the prepetition term lenders, objected to

the SC Lenders' claims, seeking disallowance on the grounds that (a) EPIL failed to perform

under the Supply and Engineering Contract and the Debtors are entitled to recovery of all

transfers made through such agreement as detailed in the Essar Affiliates Adversary Proceeding;

(b) the SC Lenders' claims, asserted as an assignee of EPIL, are subject to all of the defenses that

the Debtors could assert against EPIL; and (c) any transfers made directly from the Debtors to

the SC Lenders were made for less than reasonably equivalent value and are recoverable by the

Debtors.  Compl. at ¶ 43.

80.     The above clearly evidences that the Debtors and other secured lenders did

not intend to treat the SC Lenders' claims the same as other secured claims.  The SC Lenders'

Claims have been disputed throughout these cases, and as such, equitable subordination is not

inconsistent with any provisions of the Bankruptcy Code.

**F.**     **Declaratory Relief is Adequately Pled (Fifth Cause of Action)**

81.     The Complaint seeks a declaration that the Facility Agreement Liens held

by the SC Lenders, as the assignee of EPIL, are invalid, null, void, and of no force or effect

because EMSL did not receive any consideration in exchange for such interests.  Specifically, the

Trustee seeks a judicial declaration that (a) the Defendants' mortgage and security interests are (i) invalid or unperfected, and thus, null, void, and of no force or effect, or (ii) of no value, and not enforceable against the Debtors' estates; and (b) the mortgage and security interests are expunged and extinguished of record.

82.    Federal courts, including bankruptcy courts, may grant declaratory relief pursuant to the Declaratory Judgment Act, which provides in relevant part: "In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201. "When there is an actual controversy between the parties, the [Declaratory Judgment] Act allows a court to settle the parties' respective rights, even before there is a violation of law, exercise of right, or breach of duty." *Downingtown Indus. & Agr. School v. Commonwealth of Pa. Dept. of Education (In re Downingtown Indus. & Agr. School)*, 172 B.R. 813, 819 (Bankr. E.D. Pa. 1994).

83.    The SC Lenders argue that the declaratory judgment claim should be dismissed because the Trustee failed to plead facts showing that the SC Lenders' security interests are invalid.  The argument is derivative of the merits of the rest of the Motion: obviously, if the substantive avoidance claims were to be dismissed without leave to amend, the Trustee would be unable to obtain by declaratory judgment relief not available under substantive avoidance law.  The Trustee submits that the avoidance claims are sufficiently pled and should not be dismissed and, therefore, neither should the claim for declaratory relief.

## CONCLUSION

For the reasons stated herein, the Trustee respectfully requests that the Motion be denied in its entirety.

Dated: March 1, 2019

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
           akornfeld@pszjlaw.com
           tcairns@pszjlaw.com

*Attorneys for Bradley E. Scher, Litigation Trustee*
*to SC Mesabi Litigation Trust*